IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PIETRA LIMANDRI,                          :
                                          :
                    Plaintiff,            :          CIVIL ACTION NO. 16-2960
                                          :
          v.                              :
                                          :
ALLSTATE INSURANCE COMPANY,               :
                                          :
                    Defendant.            :

## MEMORANDUM OPINION

Smith, J.                                                        March 29, 2019

Under Pennsylvania's Motor Vehicle Financial Responsibility Law ("MVFRL"), an insurance company must provide uninsured and underinsured motorists ("UM" and "UIM", respectively; "UM/UIM", collectively) coverage limits equal to the bodily injury liability limits under an automobile insurance policy unless the named insured submits a written request for lower limits. In the instant case, the named insureds effectively lowered the UM/UIM benefits for their four vehicles under an automobile insurance policy with the defendant by executing a form request for lower UM/UIM coverage in September 2001. The named insureds later dropped their fourth vehicle from the policy, only to add another fourth vehicle a few months later. When they added the new fourth vehicle, the vehicle would have had UM/UIM coverage equal to the bodily injury limits unless the named insureds executed another document requesting lower limits on this vehicle.

In March 2003, the named insureds signed a form provided by the defendant wherein they unequivocally requested lower UM/UIM limits for this fourth vehicle. This form, however, also listed the other three vehicles covered by the policy, and the named insureds did not check any boxes indicating a selection of lower UM/UIM limits for these vehicles. At the top of the form,

there is language indicating that the policy will carry UM/UIM limits equal to the bodily injury liability limits unless the first named insured selects a lower limit.

In this action, the daughter of the named insureds was injured in an accident while driving a covered vehicle. The named insureds had reduced the UM/UIM coverage for this vehicle in September 2001, but they did not check any box for lower limits on the form request for lower UM/UIM limits in March 2003. The daughter has brought an action against her parents' insurer seeking, *inter alia*, UIM coverage equal to the bodily injury liability limits by essentially claiming that her parents' decision not to check any box for lower UM/UIM coverage in March 2003 resulted in the default UM/UIM coverage when a named insured has not affirmatively selected lower limits. The insurance company contends that the available UM/UIM coverage for the daughter is the lower coverage that the named insureds selected in September 2001. The insurer argues that the parents' failure to check any box for lower UM/UIM limits on the March 2003 form for three of their four covered vehicles does not and cannot result in higher UM/UIM coverage because the named insured has previously reduced the coverage for these vehicles and took no affirmative steps thereafter to change or increase the coverage.

Both parties have moved for summary judgment on the plaintiff's cause of action seeking a declaratory judgment. After reviewing the record, the court finds that the March 2003 reduction form was intended to reduce the UM/UIM limits for the fourth vehicle (thus bringing it into line with their UM/UIM coverage on their three other vehicles) and did not otherwise operate to increase the UM/UIM limits on the other three vehicles to the bodily injury liability limits. As such, the court will deny the plaintiff's motion for summary judgment and grant the insurance company's motion for summary judgment.

# I. PROCEDURAL HISTORY

The plaintiff, Pietra Limandri ("Plaintiff"), commenced this action by filing a complaint against the defendant, Allstate Insurance Company ("Allstate"), in the Court of Common Pleas of Lehigh County on June 3, 2016. *See* Notice for Removal of Civil Action from State Court, Ex. A, Compl., Doc. No. 1-1. In the complaint, Plaintiff alleges that in September 2013, she was involved in a motor vehicle accident caused by another motorist unlawfully proceeding through a stop sign. *See* Compl. at 1. Plaintiff suffered numerous injuries from the accident, "including but not limited to, cervical disc herniation, acute cervical strain and spasms, [a] strained left shoulder, severe migraines, and decreased range of motion in the neck[.]" *Id.* Due to her injuries, she "underwent an anterior cervical discectomy fusion surgery at C5-6 with graft plating and bone marrow aspiration." *Id.* at 2.

Plaintiff first attempted to recover damages for those injuries by suing the tortfeasor. *See id.* at 2. This lawsuit resulted in Plaintiff entering into a settlement with the tortfeasor's insurance carrier for the applicable bodily injury liability limits, *i.e.* $15,000. *See id.* At Plaintiff's request, Allstate, which had insured the vehicle Plaintiff was driving at the time of the accident, consented to the settlement with the tortfeasor in October 2015.[1] *See id.* at 2–3.

The tortfeasor's bodily injury policy limits were allegedly inadequate to compensate Plaintiff for her injuries, so she notified Allstate of her intent to seek UIM coverage under an automobile insurance policy with Allstate. *See id.* at 3, 5. Plaintiff sought $200,000 (representing a bodily injury limit of $100,000, stacked for two vehicles) from Allstate. *See id.* at 5. Allstate responded to Plaintiff's UIM benefits claim by notifying her that it believed that she was entitled to a maximum of $30,000 in UIM coverage under the applicable policy. *See id.* at 6. Then, in

---

[1] As discussed in more detail later in this memorandum opinion, Plaintiff's mother owned the vehicle Plaintiff was driving at the time of the accident. *See* Compl. at 2.

September 2015, Allstate offered Plaintiff $10,000 for her UIM claim.  *See id.*  Plaintiff provided

Allstate with additional documentation showing that her injuries and economic damages well

exceed the $10,000 offer, yet Allstate did not increase its offer even after having enough time to

review the documents.  *See id.*

Based on these allegations, Plaintiff asserts three causes of action in the complaint.  *See id.*

at 6–13.  The first cause of action is a claim for declaratory relief seeking a declaration that the

applicable insurance policy provides for UIM coverage equal to the bodily injury coverage under

the policy, $100,000 stacked for two vehicles, for a total of $200,000.  *See id.* at 6–9.  The second

cause of action is a breach of contract claim.  *See id.* at 9–11.  The final cause of action is a bad

faith claim under Pennsylvania's Bad Faith Statute, 42 Pa. C.S. § 8371.  *See id.* at 11–13.

Allstate removed the action from the Court of Common Pleas to this court on June 27,

2016, and it was originally assigned to the Honorable Lawrence F. Stengel, now retired.  *See* Doc.

No. 1.  After receiving an extension, Allstate filed an answer and affirmative defenses to the

complaint on July 27, 2016.  *See* Doc. No. 7.  The parties proceeded through discovery, and then

filed the instant cross-motions for summary judgment on February 23, 2017.[2]  *See* Doc. Nos. 15,

16.  Allstate filed a separate statement of undisputed material facts in support of its motion for

summary judgment on March 6, 2017.  *See* Doc. No. 18.  Plaintiff filed a response in opposition

to Allstate's summary judgment motion on March 7, 2017.  *See* Doc. No. 19.  Allstate filed its

response in opposition to Plaintiff's summary judgment motion on March 9, 2017.  *See* Doc. No.

---

[2] Per the scheduling order entered on September 19, 2016, Judge Stengel bifurcated the declaratory judgment action from the remaining causes of action, and the parties were to conduct discovery regarding only the cause of action for declaratory relief and complete said discovery by January 23, 2017.  *See* Order at 1, Doc. No. 14.  Plaintiff's motion is a motion for partial summary judgment in which she seeks summary judgment on only her cause of action for a declaratory judgment.

20. Plaintiff filed a response to Allstate's statement of undisputed material facts on March 31, 2017. *See* Doc. No. 22.

This matter was reassigned from then-Chief Judge Stengel to the undersigned on July 17, 2018. *See* Doc. No. 23. The undersigned heard oral argument from counsel for the parties on the cross-motions for summary judgment on August 24, 2018. The cross-motions for summary judgment are ripe for disposition.

## II.     DISCUSSION

### A.     <u>Standard of Review – Motions for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[3] Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

---

[3] The court notes, as Plaintiff is moving for partial summary judgment on her cause of action seeking a declaratory judgment, that "[t]he standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief." *Cloverland-Green Spring Diaries, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 n.12 (3d Cir. 2002).

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute").  The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252.  Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor").  Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).  Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322).  Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary

judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Nonetheless, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The summary judgment standard is the same even when, as here, the parties have filed cross-motions for summary judgment. *Erbe v. Conn. Gen. Life Ins. Co.*, No. CIV.A. 06-113, 2009 WL 605836, at *1 (W.D. Pa. Mar. 9, 2009) (citing *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006)). "When confronted with cross-motions for summary judgment . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (quoting *Transguard*, 464 F. Supp. 2d at 430).

## B.     Applicable Factual Record

### 1.     Background of Plaintiff's UIM Claim

On September 4, 2013, Plaintiff was involved in a motor vehicle accident (the "Accident"). *See* Pl.'s Statement of Undisputed Material Facts ("Pl.'s Facts") at ¶ 3, Doc. No. 16-2; Def. Allstate Ins. Co.'s Resp. to Pl.'s Statement of Material Facts ("Def.'s Resp.") at ¶ 3, Doc. No. 20-1; *see also* Def. Allstate Ins. Co.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("Def.'s Facts") at ¶ 7 (referencing allegations in complaint), Doc. No. 18; Pl.'s Resp. to Def.'s Statement of Facts ("Pl.'s Resp.") at ¶ 7, Doc. No. 22.   Infinity Select Insurance Company ("Infinity") insured the tortfeasor in the Accident, and the tortfeasor's automobile insurance policy had bodily injury liability protection limits of $15,000.  *See* Pl.'s Facts at ¶ 4; Def.'s Resp. at ¶ 4. After filing suit against the tortfeasor, Plaintiff settled with Infinity for the policy limits of $15,000. *See* Compl. at ¶ 13; Answer at ¶ 13, Doc. No. 7; Pl.'s Facts at ¶ 5; Def.'s Resp. at ¶ 5; Def.'s Facts at ¶ 8; Pl.'s Resp. at ¶ 8.   Before settling, Plaintiff requested that Allstate consent to settlement of this third-party action against the tortfeasor and Allstate provided its consent in October 2015.  *See* Pl.'s Facts at ¶ 9; Def.'s Resp. at ¶ 9.

On September 15, 2015, Plaintiff notified Allstate that she intended to make a claim for UM/UIM benefits through the Policy and provided it with medical documentation regarding her injuries and treatment.[4]  *See* Pl.'s Facts at ¶¶ 10, 11; Def.'s Resp. at ¶¶ 10, 11.  Sometime thereafter, Allstate informed Plaintiff that it believed she was entitled to UIM benefits in the maximum amount of $15,000/$30,000 stacked for two vehicles, totaling $30,000 in UIM coverage.  *See* Pl.'s Facts at ¶ 12; Def.'s Resp. at ¶ 12.

---

[4] Allstate claims that Plaintiff "only submitted medical documentation for treatment through May 6, 2015, along with an opinion by her treating doctor that she was not a surgical candidate."  Def.'s Resp. at ¶ 11.

## 2. Facts Related to the Policy

At the time of the Accident, Plaintiff asserts that she was driving a 2003 Isuzu Rodeo owned by her mother, Paula Limandri ("Mrs. Limandri"),[5] and insured by Allstate policy no. 018152198 (the "Policy"), issued to Mrs. Limandri. *See* Def.'s Facts at ¶ 9; Pl.'s Resp. at ¶ 9. The Auto Policy Declarations state that the Policy provides UIM insurance with stacked limits of $15,000 each person, $30,000 each accident. *See* Def.'s Facts at ¶ 11; Pl.'s Resp. at ¶ 11 (admitting to what Declarations stated but denying that Plaintiff's parents "affirmatively selected such limits"). At the time of the Accident, the Policy covered two motor vehicles, the 2003 Isuzu Rodeo and a 2001 Mazda Protégé. *See* Def.'s Facts at ¶ 10; Pl.'s Resp. at ¶ 10; Pl.'s Facts at ¶ 48; Def.'s Resp. at ¶ 48. Plaintiff was an "insured" under the Policy.[6] *See* Pl.'s Facts at ¶ 8; Def.'s Resp. at ¶ 8.

Mrs. Limandri testified at her deposition that she and Vincenzo Limandri ("Mr. Limandri") worked with Alex Ramos ("Ramos") in the purchase of their auto insurance.[7] *See* Def.'s Facts at ¶ 12; Pl.'s Resp. at ¶ 12. Mrs. Limandri also stated that in their conversations with Ramos, she wanted all the coverages for the family's various cars to be the same. *See* Def.'s Facts at ¶ 13; Pl.'s Resp. at ¶ 13.

---

[5] Throughout the record, Mrs. Limandri's first name is also noted as Paola.

[6] Kathleen Collard ("Collard"), a senior field support representative for Allstate, testified that the Limandris added Plaintiff as an authorized driver under the Policy in May 1995. *See* Pl.'s Facts, Ex. C, Dep. of Kathleen Collard ("Collard Dep.") at 27–28, Doc. No. 16-7. Plaintiff resided with Mr. and Mrs. Limandri (while Mr. Limandri was living) at all relevant times, and although Plaintiff is listed as a driver on the Policy, she was not a named insured, and she acknowledged at her deposition that she had no role or discussions with any insurance agent, including Ramos, regarding being added to the Policy or being insured under the Policy. *See* Def.'s Facts at ¶ 28; Pl.'s Resp. at ¶ 28. Plaintiff also did not have any discussions with her parents about the coverages under the Policy. *See* Def.'s Facts at ¶ 28; Pl.'s Resp. at ¶ 28. In addition, Plaintiff never paid any of the Policy premiums; instead, her parents paid the premiums and made the decisions on the coverage to obtain. *See* Def.'s Facts at ¶ 29; Pl.'s Resp. at ¶ 29.

[7] Ramos testified that he has been a "captive Allstate agent" for the past 38 1/2 years. *See* Pl.'s Facts, Ex. B, Dep. of Alex R. Ramos ("Ramos Dep.") at 14, Doc. No. 16-6. He also testified that Mr. Limandri and Mrs. Limandri have been his customers since 1985. *See id.*; *see also* Pl.'s Facts at ¶ 6; Def.'s Resp. at ¶ 6. According to Plaintiff, Mr. Limandri "died in 2010[, and] Mrs. Limandri continued coverage with Allstate subsequent to Mr. Limandri's death." Pl.'s Facts at ¶ 6, n.1.

Ramos testified that when customers, such as the Limandris, desire insurance for a vehicle in addition to vehicles already on a policy, UM and UIM limits cannot be lower than the liability limits unless the customer "signs down" for the lower limit. *See* Def.'s Facts at ¶ 14; Pl.'s Resp. at ¶ 14. Ramos also testified that when a customer calls to insure an additional vehicle with UM/UIM limits lower than the liability limits, the agent explains that without a written request the vehicle would be added with UM/UIM limits at the higher (liability) limits; the agent sends the customer a sign-down form to request lower limits, without which the higher liability limits would apply to the UM/UIM limits, and the customer is charged a higher premium for that specific car until the executed form is returned.[8] *See* Def.'s Facts at ¶ 15; Pl.'s Resp. at ¶ 15. Ramos confirmed that Mrs. Limandri was very specific and smart about the Policy and always wanted to keep everything uniform. *See* Def.'s Facts at ¶ 16; Pl.'s Resp. at ¶ 16; *see also* Ramos Dep. at 43–44.

As an Allstate senior field support representative, Collard testified at her deposition that she reviewed the Policy's history from 1985 forward and, in 1988, when the Limandris moved from Florida to Pennsylvania with one vehicle, the UM/UIM coverage was $15,000/$30,000. *See* Def.'s Facts at ¶ 17; Pl.'s Resp. at ¶ 17. The 2001 Mazda Protégé on the Policy at the time of the Accident was added to the Limandris' coverage in the June 3, 2001, to December 3, 2001 policy period. *See* Def.'s Facts at ¶ 18; Pl.'s Resp. at ¶ 18. The 2001 Mazda Protégé replaced another covered vehicle, a 1990 Ford Thunderbird, as "Vehicle 2," the UM/UIM limits of $15,000/$30,000 for the replaced vehicle also applied to the 2001 Mazda Protégé, and no new sign-down form was required to keep UM/UIM coverage on the 2001 Mazda Protégé at $15,000/$30,000, where the

---

[8] Ramos testified that he and his staff discuss various options with customers, and he only recommends that the customers (1) not waive UM/UIM, and (2) buy UM/UIM. *See* Ramos Dep. at 16–17. In addition, he explained that when "[a] customer calls . . . to add a vehicle[, w]e explain the forms, and we tell them at that point what the form is about, why it's mandatory, and why we are sending it out to them and how imperative it is for us to get it back." *Id.* at 19.

limits of UM/UIM coverage remained through the date of the Accident. *See* Def.'s Facts at ¶ 19; Pl.'s Resp. at ¶ 19. Collard testified that the Limandris added the 2003 Isuzu Rodeo involved in the Accident to the Policy on April 9, 2003, with it replacing a 1999 Plymouth Neon as "Vehicle 3" on the Policy. *See* Def.'s Facts at ¶ 20; Pl's Resp. at ¶ 20.

On September 26, 2001, following the addition of a 1993 Ford Escort as "Vehicle 4" on the Policy, Mr. Limandri executed a sign-down form for lower UM/UIM limits for each of the four vehicles then on the Policy, including the 1999 Plymouth Neon, pursuant to which $15,000/$30,000 UM/UIM limits were in place for the 1999 Plymouth Neon and, as such, the 2003 Isuzu Rodeo which replaced it (the "September 2001 Form").[9] *See* Def.'s Facts at ¶ 21; Pl.'s Resp. at ¶ 21; Pl.'s Facts at ¶¶ 24, 26; Def.'s Resp. at ¶¶ 24, 26; Collard Dep. at 34. Prior to this date, the Limandris had not returned a sign-down form requesting lower limits for "Vehicle 3", then the Plymouth Neon, and so the liability limits of $100,000/$300,000 applied to the UM/UIM coverage

---

[9] Collard acknowledged that by this point in September 2001, the Limandris owned four vehicles. *See* Pl.'s Facts at ¶ 25; Def.'s Facts at ¶ 25; Collard Dep. at 25. Mrs. Limandri testified that she did not recall ever seeing the September 2001 Form. *See* Def.'s Facts, Ex. C, Dep. of Paola Limandri ("Mrs. Limandri Dep.") at 25, 36–37, Doc. No. 15-5. She also testified that the signature on the September 2001 Form appeared to be Mr. Limandri's. *See id.* at 37.

Collard indicated that requests to lower coverage limits are effective on the date signed by the insured. *See* Collard Dep. at 21; *see also* Pl.'s Facts at ¶ 14; Def.'s Resp. at ¶ 14. Regarding when a request for lower limits is necessary, Collard testified as follows:

> A  The waiver is signed when coverages are changed. So, if there's a replacement car and he changes his underinsured, he would have to sign the form. If he drops the car, he would not. If he adds a fourth vehicle and he changes the coverage, he has to. The event makes the forms generate to be signed.
> Q  What types of change in coverage trigger having to sign a new form.
> A  Lowering the limits.
> Q  Anything else, any other types of change in coverage that requires signing a new form?
> A  Changing from what they had.
> Q  Changing from what they had --
> A  Prior. And now if he wants 15/30 or if he wants 25/50, he would have to sign a new form.
> Q  Changing the amount of coverage?
> A  Yes.
> Q  Either raising or lowering it?
> A  Yes.
> Q  Anything else that would trigger it?
> A  Not that I would think.

Collard Dep. at 38–39.

on the third of their then-three insured vehicles, with $15,000/$30,000 UM/UIM limits applying to the other two. *See* Def.'s Facts at ¶ 22; Pl.'s Resp. at ¶ 22. Nonetheless, Mr. Limandri's executed request for lower limits on September 26, 2001, was for UM/UIM limits of $15,000/$30,000 for all vehicles on the Policy. *See* Def.'s Facts at ¶ 23; Pl.'s Resp. at ¶ 23; *see also* Ramos Dep. at 28 (stating that as of September 26, 2001, Limandris had UIM benefits for four vehicles at $15,000/$30,000 for each vehicle).[10]

From August 18, 2002, to March 7, 2003, the Limandris had three vehicles on the Policy. *See* Collard Dep. at 41, 43; *see also* Pl.'s Facts at ¶ 29 ("Prior to March 2003, the Limandris dropped a vehicle so that the Policy only covered their three vehicles."). On March 6, 2003, the Limandris added a 2001 Pontiac Sunfire as a fourth vehicle to the Policy.[11] *See* Def.'s Facts at ¶¶ 24, 27; Pl.'s Resp. at ¶¶ 24, 27; *see also* Pl.'s Facts at ¶ 30; Def.'s Resp. at ¶ 30. The Limandris reduced the $100,000/$300,000 UIM coverage on this vehicle on March 12, 2003, by executing a sign-down form on March 10, 2003 (the "March 2003 Form").[12] *See* Def.'s Facts at ¶ 27; Pl.'s Resp. at ¶ 27; Pl.'s Facts at ¶ 32; Def.'s Resp. at ¶ 32; *see also* Compl. at ¶ 22; Answer at ¶ 22.

The March 2003 Form listed four unidentified vehicles: Vehicle 1; Vehicle 2; Vehicle 3; and Vehicle 4. *See* Pl.'s Facts at ¶ 35 & Ex. F at ECF p. 6; Def.'s Resp. at ¶ 35; Compl., Ex. D.

---

[10] Ramos also testified that there was no reason to re-mark the boxes if the Limandris were already at the $15,000/$30,000 limits, but he believes that his office probably marked them all to make them uniform. *See* Ramos Dep. at 30.

[11] For reasons unknown, Allstate includes two different dates for the addition of the Pontiac Sunfire. *Compare* Def.'s Facts at ¶ 24 (stating that Limandris added Pontiac Sunfire on March 6, 2003), *with* Def.'s Resp. at ¶ 29 ("A fourth vehicle was added on March 7, 2003.") In addition, Collard seemingly testified that the Limandris added the Pontiac Sunfire on March 7, 2003. *See* Collard Dep. at 43.

[12] Plaintiff acknowledged during her deposition that she did not have any discussions with Mr. Limandri about what he wanted or intended to obtain through the Policy, and she stated that she lacked personal knowledge or information concerning the claim asserted in the complaint that Mr. Limandri intended in March 2003 to select lower UIM limits for one vehicle and obtain $100,000 stacked UIM limits for the remaining vehicles. *See* Def.'s Facts at ¶ 30; Pl.'s Resp. at ¶ 30. In addition, Ramos testified that he did not recall having any conversations with the Limandris about the March 2003 Form. *See* Ramos Dep. at 36.

On the form, there is an "X" mark to elect UM/UIM coverage in the amount of $15,000/$30,000 for Vehicle 4.[13]  *See* Compl., Ex. D.  There are no other selections on the form.[14]  *See id.*

On March 8, 2003, Plaintiff was involved in a motor vehicle accident, and she subsequently brought an UIM claim which Allstate settled with her in the amount of $140,000.  *See* Def.'s Facts at ¶ 25; Pl.'s Resp. at ¶ 25.  Allstate's files reflect that Plaintiff's attorney for the March 8, 2003 accident had demanded only $60,000, believed to be the UIM limit ($15,000) on four vehicles (stacked), but Allstate's adjuster discovered that Allstate was charging a premium based on $100,000 in UIM coverage for one of the vehicles on the Policy, the newly added Pontiac Sunfire; therefore, in good faith, the adjuster negotiated the $140,000 settlement based on $145,000 in total possible UIM coverage for the March 8, 2003 accident.[15]  *See* Def.'s Facts at ¶ 26; Pl.'s Resp. at ¶ 26.

At all times after March 10, 2003, and up to the date of the Accident, the Policy renewals indicated $15,000/$30,000 UIM coverage on all the vehicles under the Policy.[16]  *See* Def.'s Facts at ¶ 31; Pl.'s Resp. at ¶ 31.  Policy renewals were sent every six months, and they were also sent if there were any changes during the six-month intervals.[17]  *See* Def.'s Facts at ¶ 32; Pl.'s Resp. at

---

[13] Ramos testified that although he was uncertain, he was 90% sure that a member of his staff placed the "X" on the form.  *See* Ramos Dep. at 38–39.  He also stated that he did not know whether the Limandris asked for UM/UIM limits equal to the liability limits at this time, and does not recall any conversation where they requested any change in their UM/UIM coverage.  *See id.* at 42–43.

[14] Collard testified at her deposition that even though the March 2003 Form did not have checked boxes for Vehicles 1 through 3, the UM/UIM coverage limits would not default to the bodily injury policy limits because the Limandris had already reduced UM/UIM coverage limits to $15,000/$30,000.  *See* Collard Dep. at 31.

[15] Plaintiff asserts that her attorney was under the mistaken belief that UM/UIM coverage was limited to $15,000/$30,000 stacked.  *See* Pl.'s Resp. at ¶ 36.

[16] Mrs. Limandri testified that she and her husband did not look at the renewal mailings, and she never checked to see what coverages were on them or if they were what they had requested.  *See* Mrs. Limandri Dep. at 16.

[17] According to Allstate, Plaintiff submitted a request for UIM benefits for a 2005 accident through a Florida attorney, but she ultimately abandoned the case.  *See* Def.'s Facts at ¶ 33.  It appears that an Allstate claims representative provided the attorney a certified declarations page stating that Plaintiff's UM/UIM coverage was $15,000/$30,000.  *See id.*; *see also* Def.'s Facts, Ex. F, Dep. of Christopher Hornick ("Hornick Dep.") at 33–36, Doc. No. 15-8.  Plaintiff's response to these factual averments does not appear to relate to the statement insofar as she references a 2001 UIM coverage request.  *See* Pl.'s Resp. at ¶ 33.  Nonetheless, giving Plaintiff the benefit of the doubt that her response is responsive, she appears to contend that even if Allstate provided the information about coverage to her

¶ 32; *see also* Hornick Dep. at 19–20 ("Allstate as a company and through their agency sent normal renewals every six months to the Limandris which showed, on the declarations page, what coverage they had, what their premiums were, and what coverages were applicable to each vehicle they had in the household.").

The sign-down forms the Limandris executed on September 26, 2001 and March 10, 2003 stated: "The limits selected above will apply to all future renewals, continuations, and changes in your policy unless you contact your Allstate agent or we notify you otherwise." *See* Def.'s Facts at ¶ 34; Pl.'s Resp. at ¶ 34; Pl.'s Facts at ¶ 33; Def.'s Resp. at ¶ 33. The forms also state as follows:

> If the first named insured has not rejected Uninsured Motorists Insurance (Coverage SS), Coverage SS limits will be included in your policy at limits equal to your Bodily Injury Liability (Coverage AA) limits unless the first named insured selects lower limits.

> If the first named insured has not rejected Underinsured Motorists Insurance (Coverage SU), Coverage SU limits will be included in your policy at limits equal to your Bodily Injury Liability (Coverage AA) limits unless the first named insured selects lower limits.

Pl.'s Facts at ¶ 23; Def.'s Resp. at ¶¶ 23, 33.[18]

## C.     Analysis

### 1.     Applicable Law on Insurance Policy Interpretation

As this court is sitting in diversity jurisdiction, the court

> must apply the substantive law as decided by the highest court of the state whose law governs the action. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Commercial Union Ins. Co. v. Bituminous Casualty Corp.*, 851 F.2d 98, 100 (3d Cir. 1988). When the state's highest court has not addressed the precise question presented, a federal court must predict how

---

Florida attorney, she did not receive any information about the available coverage. *See id.* The court also presumes that Plaintiff believes that the declarations page was incorrect (at least regarding UM/UIM coverage).

[18] During his deposition, Ramos testified that if a customer adds a vehicle to an existing policy, Allstate cannot change the UIM limits to a lower limit unless the customer signs down for it, and Allstate charges the customer a higher premium until the customer returns the sign-down form. *See* Ramos Dep. at 15. As indicated throughout this opinion, Allstate employees appear to refer to the forms in which a named insured potentially selects lower UM/UIM coverage limits as a "sign-down form."

14

the state's highest court would resolve the issue. *Borman v. Raymark Indus., Inc.*, 960 F.2d 327, 331 (3d Cir. 1992). Although not dispositive, decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise. *See Rolick v. Collins Pine Co.*, 925 F.2d 661, 664 (3d Cir. 1991), *cert. denied*, 507 U.S. 973, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993).

*Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1373 n.15 (3d Cir. 1996).

Both parties agree that Pennsylvania substantive law applies to this matter. *See* Br. in Supp. of Def. Allstate Ins. Co.'s Mot. for Summ. J. ("Def.'s Br.") at 7 ("The district court, exercising diversity jurisdiction in this declaratory judgment action, applies the substantive law of Pennsylvania."), Doc. No. 15-10; Pl.'s Br. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Br.") at 10, n.2 ("There is no dispute that Pennsylvania law applies."), Doc. No. 16-1. When interpreting an insurance contract, Pennsylvania courts apply the following rules of contract interpretation:

> "The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury." *Madison Construction Co. v. Harleysville Mutual Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 106 (1999) (citations omitted); *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563, 566 (1983). The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy. *Gene & Harvey Builders, Inc. v. Pennsylvania Manufacturers' Association Ins. Co.,* 512 Pa. 420, 517 A.2d 910, 913 (1986) (*quoting Standard Venetian Blind Co.* (citations omitted)). When the language of the policy is clear and unambiguous, a court is required to give effect to that language. *Id.* When a provision in a policy is ambiguous, however, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage. *See id.* "Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Madison Construction Co.,* 735 A.2d at 106 (*quoting Hutchison v. Sunbeam Coal Co.,* 513 Pa. 192, 519 A.2d 385, 390 (1986)). Finally, "[i]n determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract, do not assume that its language was chosen carelessly." *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 662 (1982) (*quoting Moore v. Stevens Coal Co.,* 315 Pa. 564, 173 A. 661, 662 (1934)). Thus, we will not consider merely individual terms utilized in the insurance contract, but the entire insurance provision to ascertain the intent of the parties.

*401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005). In addition, "[w]hether a particular loss is within the coverage of an insurance policy is . . . a question of law and may be decided on a motion for summary judgment in a declaratory judgment action." *State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Ins. Co.*, 657 A.2d 1252, 1255 (Pa. Super. 1995).

As this matter involves the reduction of UM/UIM benefits, the MVFRL applies. The MVFRL, *inter alia*, establishes the obligations of insurance companies with respect to UM/UIM coverage.[19] *See Sayles v. Allstate Ins. Co.*, 260 F. Supp. 3d 427, 443 (M.D. Pa. 2017) (referencing *Erie Insurance Exchange v. Dzadony*, 39 Pa. D. & C.3d 33, 1986 WL 2077 (C.P. Allegheny 1986) and trial judge's notation that "the MVFRL 'is comprehensive legislation governing the rights and obligations of the insurance company and the insured under liability insurance policies covering motor vehicles'"). The MVFRL provides that automobile insurance companies must offer UM/UIM coverages "in amounts as provided in section 1734 (relating to request for lower limits of coverage)." 75 Pa. C.S. § 1731(a); *see also Weilacher v. State Farm Mut. Auto. Ins. Co.*, 65 A.3d 976, 983 (Pa. Super. 2013) ("Section 1731 mandates that an insurance company issuing a policy in the Commonwealth of Pennsylvania must provide UM/UIM coverage equal to the bodily

---

[19] Regarding the policies underlying the MVFRL,

> [t]he Pennsylvania Supreme Court discussed the policies underlying the MVFRL in *Lewis v. Erie Ins. Exchange*, 793 A.2d 143 (Pa. 2002). The court explained that the Pennsylvania General Assembly, in enacting the MVFRL, was concerned with containment of rising insurance costs. *Lewis*, 793 A.2d at 151. The court found the requirements under the MVFRL for UIM coverage serve to promote recovery for accident victims in the event negligent motorists are not adequately insured. *Id. Lewis* summarized that review of sections 1731 and 1734
>
> > is informed by their integration into a scheme for motorist insurance which has been adjusted to preserve the availability of core remedial aspects while also promoting, with increasingly greater emphasis, the containment of insurance costs. With this background, we consider the statutory terms as written, as they relate to each other, and in their context within the surrounding framework.
>
> 793 A.2d at 152.

*Selective Ins. Co. of Am. v. Novitsky*, Civ. A. No. 3:17-CV-2376, 2019 WL 1009388, at *7–8 (M.D. Pa. Mar. 1, 2019).

injury liability coverage, unless the insured validly rejects UM/UIM coverage or validly requests lower limits of coverage pursuant to section 1734." (citing *Blood v. Old Guard Ins. Co.*, 934 A.2d 1218, 1226 (Pa. 2007))).[20]  Section 1734 states that "[a] named insured may request in writing the issuance of coverages under section 1731 (relating to availability, scope and amount of coverage) in amounts equal to or less than the limits of liability for bodily injury." 75 Pa. C.S. § 1734.  Thus, "§§ 1731(a) and 1734 of the MVFRL . . . (1) require an insurer to provide UIM coverage equal to the bodily injury coverage in its policies and (2) allow a named insured to request lower UIM coverage limits than the bodily injury coverage amounts." *Nationwide Ins. Co. v. Resseguie*, 980 F.2d 226, 230 (3d Cir. 1992).  The request to change UM/UIM limits must "be made *in writing by the insured.*" *Motorists Ins. Co. v. Emig*, 664 A.2d 559, 565 n.1 (Pa. Super. 1995) (emphasis in original); *see also Resseguie*, 980 F.2d at 231 (agreeing with district court's holding that "'Section 1734 requires the named insured to request in writing that the limits of her coverage be lowered. Short of a written request by [the named insured] for the lower coverage, … Nationwide simply was not authorized to alter her policy.'" (omission in original) (quoting *Nationwide Ins. Co. v. Resseguie*, 782 F. Supp. 292, 294 (M.D. Pa. 1992))).

In addition,

> the § 1734 written request for lower coverage limits requirement must be construed strictly.  Overall, [t]he MVFRL, of which Sections 1734 and 1791 are a part, is to be construed liberally in order to promote justice and to give effect to its objects.  One of the objects of the MVFRL to be effected by this liberal construction is affording the injured claimant the greatest possible coverage.  We must remain mindful that [i]n close or doubtful cases, we must interpret the intent of the legislature and the language of insurance policies to favor coverage for the insured.

*Erie Ins. Exchange v. Larrimore*, 987 A.2d 732, 740 (Pa. Super. 2009) (alterations in original) (internal citations and quotation marks omitted); *see also Resseguie*, 980 F.2d at 232 (predicting

---

[20] Section 1731(a) also provides that "[p]urchase of uninsured motorist and underinsured motorist coverages is optional." 75 Pa. C.S. § 1731(a).

that "the Pennsylvania Supreme court would narrowly and strictly construe the provision of the MVFRL that allows an insured to request lower UIM coverage limits than are mandated by § 1731" (footnote omitted)).

Concerning validly requesting a reduction of UM/UIM coverage,

[i]n order to effect a valid request for reduction pursuant to § 1734, the named insured's written request must (1) manifest the insured's desire to purchase uninsured and underinsured coverage in amounts equal to or less than the bodily injury limits; (2) be signed by the named insured; and (3) include an express designation of the amount of uninsured and underinsured coverage requested. Hence, to conform with § 1734, the written request must be signed by the insured and must contain an express designation of the amount of coverage requested, all manifesting the insured's desire to purchase coverage in amounts less than the bodily injury limits.

*Nationwide Mut. Ins. Co. v. Catalini*, 18 A.3d 1206, 1209 (Pa. Super. 2011) (citations and quotation marks omitted). Section 1734 does not "dictate[] the particular language that the parties must utilize to accomplish a valid request for the reduction of uninsured and underinsured motorist coverage limits." *Hartford Ins. Co. v. O'Mara*, 907 A.2d 589, 603 (Pa. Super. 2006) (citation omitted).

In the instant case, the parties' arguments can be summarized as follows: Plaintiff asserts three arguments in support of her claim that the court should grant summary judgment in her favor and declare that the amount of her UIM coverage is $100,000/$300,000 stacked for two vehicles. *See* Pl.'s Br. at 2. First, Plaintiff contends that the plain language of the March 2003 Form supports her claim for $200,000 of UIM coverage. *See id.* at 10. In this regard, Plaintiff points out that the March 2003 Form does not expressly designate the amount of UM/UIM coverage for Vehicles 1 through 3, except for the language on the form stating: "If the first named insured has not rejected [UM/UIM Insurance, the UM/UIM] limits will be included in your policy at limits equal to your Bodily Injury Liability . . . limits unless the first named insured selects lower limits.". *See id.* at

13; *see also* Compl., Ex. D. Plaintiff asserts that the March 2003 Form did not inform the Limandris that the failure to make a specific election (by checking one of the boxes on the form) would result in the prior election remaining in effect. *See id.* Plaintiff notes that Collard testified during her deposition that a request for lower UM/UIM limits stays in effect until there is a new election on a new form. *See id.* (citing Collard Dep. at 24, 47–48). Thus, the March 2003 Form superseded any prior elections for UM/UIM coverage, and "[g]iven the strict requirements for waiving or reducing UM/UIM Coverage and the policy reasons for the same, it is clear that the Limandris did not effectively reduce their UM/UIM Coverage for vehicles one (1) through three (3)." *See id.* at 14.

Plaintiff's second argument is that the March 2003 Form is ambiguous and, pursuant to Pennsylvania law, must be interpreted against Allstate. *See id.* at 15–16. As already mentioned, Plaintiff contends this form, read in isolation, provides that UM/UIM coverage will be equal to the bodily injury liability limits unless the named insured specifically requests lower limits, and it does not state that it will be read in conjunction with prior requests. *See id.* at 16. In addition, she asserts that both the September 2001 Form and the March 2003 Form listed each of the four vehicles and seemingly required the Limandris to make an UM/UIM coverage election for each vehicle, with the failure to make such an election defaulting the UM/UIM coverage to the bodily injury limits. *See id.* Plaintiff also points out that (1) Ramos did not know why the March 2003 Form was only checked for Vehicle 4, and (2) Ramos testified that after 2003, Allstate changed the form so the request to lower limits would identify only the new vehicle for which the insured needed to elect coverage and it even preselected the coverages for the client. *See id.* at 16–17 (citing Ramos Dep. at 33–34).

For her final argument, Plaintiff argues that the bi-annual renewals and the payments of lower premiums over an approximately ten-year period are irrelevant in this court's determination of the amount of coverage. *See id.* at 17. She notes that "the presumption that the insured has notice of available UM/UIM Coverage options when provided with the statutorily-mandated notice does not relieve the insurer of providing UM/UIM limits equal to third-party liability coverage absent the insured's written request for lower coverage limits." *Id.* (citing *Brethren Mut. Ins. Co. v. Triboski-Gray*, 584 F. Supp. 2d 687, 693 (M.D. Pa. 2008)). She also asserts that an insured's actual knowledge of lower coverage provided by the insurer is legally insignificant absent a valid written request of the insured for reduced UM/UIM Coverage." *Id.* (citing *Resseguie*, 980 F.2d at 233). She further states that "[a]n insured's payment of premiums for several years with policy providing UM/UIM Coverage less than liability limits does not operate as a waiver of the statutory right to UM/UIM Coverage equal to liability limits, unless the insured executed a valid request for lower UM/UIM Coverage." *Id.* at 18 (citing *Breuninger v. Pennland Ins. Co.*, 675 A.2d 353 (Pa. Super. 1996)).

In support of its motion for summary judgment, Allstate generally argues that Plaintiff is only entitled to $15,000/$30,000 in UM/UIM coverage stacked by two vehicles. *See* Def.'s Br. at 1.[21] Allstate notes that "'[t]he fact that the MVFRL requires insurance companies to follow strict guidelines when an insured waives the entirety of his uninsured/underinsured coverage does not necessarily mean that such strict procedures are required where the insured takes the less drastic step of lowering his limits of liability.'" *Id.* at 9 (quoting *Guglielmelli v. State Farm Mut. Ins. Co.*,

---

[21] At the end of its supporting brief, Allstate asserts that it is entitled to summary judgment on the breach of contract and bad faith counts in the complaint because entering judgment in its favor on those causes of action necessarily follows the court granting summary judgment on the declaratory judgment claim. *See* Def.'s Br. at 16. The court will not address these arguments here because Judge Stengel's scheduling order bifurcated the declaratory judgment action from the remaining causes of action and directed the filing of dispositive motions relating to only the declaratory judgment claim. *See* Order at 1, Doc. No. 14.

72 F. Supp. 3d 588, 593 (E.D. Pa. 2014) (citing *Leymeister v. State Farm Mut. Auto. Ins. Co.*, 100

F. Supp. 2d 269, 272 (M.D. Pa. 2000)), *aff'd* 628 F. App'x 137 (3d Cir. 2015), *cert. denied*, 136

S.Ct. 1659 (2016)).

Regarding the March 2003 Form, Allstate points out that the Limandris had already

dropped UM/UIM coverage to $15,000/$30,000 on all their insured vehicles (including the 1999

Plymouth Neon for which the 2003 Isuzu Rodeo involved in the Accident replaced) in September

2001. *See id.* at 11. The Isuzu Rodeo was therefore "'subject to the same uninsured/underinsured

limits that previously existed under the policy'" in September 2001. *See id.* (quoting *Guglielmelli*,

72 F. Supp. 3d at 593). Also, both the September 2001 Form and March 2003 Form stated that

"'[t]he limits selected above will apply to all future renewals, continuations, and changes in your

policy unless you contact your Allstate agent or we notify you otherwise.'" *Id.* at 12 (quoting

September 2001 Form and March 2003 Form).

Allstate also contends that Plaintiff cannot simply rely on the fact that the Limandris

checked only the "15/30" box for UM/UIM coverage on Vehicle 4 in the March 2003 Form

because there is no evidence that the Limandris ever intended to select the $15,000/$30,000 limit

only on Vehicle 4 (the 2001 Pontiac Sunfire) and then have the UM/UIM coverage on the other

three vehicles changed to $100,000/$300,000. *See id.* It points out that Mrs. Limandri testified

that she wanted the coverages on all their vehicles to be uniform. *See id.* It also asserts that the

"onus is on the named insured to request changes to underinsured motorist benefits." *Id.* (citing

*Guglielmelli*, 628 F. App'x at 140); *see also* Br. of Def., Allstate Ins. Co., in Opp. to Pl.'s Mot. for

Partial Summ. J. at 6, Doc. No. 20-3 (citations omitted). It further asserts that

> [t]here is utterly no legal basis for a claim that Allstate had to obtain a request for
> $15,000/$30,000 limits on the three vehicles already and indisputably insured for
> that amount on the Policy, or that the named insureds' check-mark for the

$15,000/$30,000 UIM limit on "vehicle 4" somehow changed the $15,000/$30,000 limits already in place for the other three vehicle [sic] to $100,000.

*Id.* at 13.

As additional support, Allstate references Plaintiff's prior interaction with Allstate regarding two other accidents in which she made UM/UIM claims and asserts that this validates its contention that the Policy provided only a $15,000/$30,000 stacked UM/UIM limit at the time of the Accident. *See id.* For Plaintiff's March 2003 accident, Plaintiff received the $100,000/$300,000 UM/UIM limit for one vehicle (the 2001 Sunfire) because Allstate had not yet received the sign-down form for this vehicle and was charging the Limandris a premium based on the $100,000/$300,000 UM/UIM limit. *See id.* Once Allstate received the March 2003 Form, it lowered the UM/UIM limit to $15,000/$30,000 for the Pontiac Sunfire. *See id.* Allstate also points out that after the March 2003 Form, the Limandris received policy renewals every six months showing that all vehicles had a stacked $15,000/$30,000 UM/UIM limit. *See id.* In addition, when Plaintiff's Florida attorney contacted Allstate about her 2005 accident, Allstate provided the attorney a certified declarations page showing that her UM/UIM coverage was $15,000/$30,000. *See id.*

Allstate relies significantly on the district court and the Third Circuit's decisions in *Guglielmelli* and the Superior Court of Pennsylvania's decision in *Kimball v. Cigna Ins. Co.*, 660 A.2d 1386 (1995) to support their argument that the Limandris needed to affirmatively act to increase their coverage on Vehicles 1 through 3 when they had previously reduced the UM/UIM limits on those vehicles. In particular, Allstate points out that, in deciding matters against the insureds in those cases, the courts focused on the inaction by the insureds to correct a coverage issue if they were seeking greater coverage. *See id.* at 14. Allstate states that in *Guglielmelli*, the district court explained that the plaintiff's policy had been renewed nine times over approximately

four years with all the renewals showing a reduced limit for UM/UIM coverage. *See id.* (citing *Guglielmelli*, 72 F. Supp. 3d at 594). The district court also stated that the plaintiff could have contacted the insurer to increase the liability limits, but did not, and ended up benefiting from lower premiums. *See id.* As such, the court found that the plaintiff was bound by the sign-down executed by another named insured on the applicable policy. *See id.*

> Similarly, Allstate argues that the Limandris are like the plaintiff in *Kimball* because they
>
>> took no action to seek a higher level of coverage. They could have increased coverage under the Allstate Policy, with correspondingly higher premiums, or Plaintiff could have sought to secure "her own separate policy should her mother not be amenable to the increased coverage and additional cost associated therewith. The plaintiff took no action on either front."

*Id.* (quoting *Kimball*, 660 A.2d at 1389).[22] Here, the Limandris received at least 20 renewals showing the lower limit for UM/UIM coverage, and did not contact their Allstate agent, Ramos, or Allstate about the desire for higher UM/UIM coverage. *See id.* at 14–15. In addition, the

---

[22] In *Kimball*, the plaintiff was originally listed as a driver under her father's insurance policy. *See* 660 A.2d at 1386–87. The plaintiff's parents divorced, and her mother became the named insured under the policy. *See id.* at 1387. The plaintiff's mother executed a sign-down reducing the amount of UM/UIM coverage, and approximately a year later, the plaintiff was added as a named insured. *See id.* The insurance company never told the plaintiff that she could carry UM/UIM limits equal to the bodily injury liability limit. *See id.*

After the plaintiff was injured by an uninsured motorist, she attempted to recover under the UM provisions in her policy, but the insurance company indicated that she was bound to the same limits of coverage as her mother elected when she signed-down. *See id.* She filed an action against the insurance company, and she won at the trial court. *See id.* The insurance company filed an appeal to the Superior Court, and the Superior Court reversed the trial court.

In reversing the trial court, the Superior Court pointed out that even though the plaintiff was not a named insured when her mother signed-down the UM limits, she was a named insured when an endorsement amending the policy was received at her household. *See id.* at 1388-89. This endorsement clearly showed the reduced UM limits. *See id.* at 1389. Yet, the plaintiff took no action. *See id.* The Superior Court explained that the plaintiff "could have increased coverage under her mother's policy (with accompanying premium increases) or secured her own separate policy should her mother not be amenable to the increased coverage and additional cost associated therewith." *Id.* The plaintiff failed to do so. The court also noted that the limits were in effect for two renewal periods without the plaintiff having acted, and the premiums were paid without questioning the insurance company's agent about the coverage. *See id.* The court explained that "[t]o find that the plaintiff is not bound by her mother's election and remaining silent on the issue of increased coverage, while reaping the benefits of reduced rates, would be to reward inaction. Here, the plaintiff had the means and opportunity to avoid any insurance shortfall, but she took no action to remedy the matter." *Id.*

Limandris paid premiums for this lower level of UM/UIM coverage, also without question or complaint to Ramos. *See id.* at 15. Therefore, Allstate argues

> "[t]o find that the plaintiff is not bound by her mother's election and remaining silent on the issue of increased coverage, while reaping the benefits of reduced rates, would be to reward inaction. Here, the plaintiff had the means and opportunity to avoid any insurance shortfall, but she took no action to remedy the matter."

*Id.* (quoting *Kimball*, 660 A.2d at 1389).

The court has summarized the parties' contentions in their supporting memoranda at length because the instant case presents an unusual set of factual circumstances dissimilar to the facts of any case cited by the parties or that the court has independently located. Nonetheless, the initial focal point in resolving the competing motions for summary judgment must be the March 2003 Form itself. This form, which is identical to the September 2001 Form (other than the information entered into the form), contains the following language near the top of the form (with respect to UIM coverage): "If the first named insured has not rejected [UIM] Coverage, limits will be included in your policy at limits equal to your Bodily Injury Liability . . . limits unless the first named insured selects lower limits."[23] Pl.'s Br., Ex. F at ECF p. 6, Doc. No. 16-14. The form then lists the possible available limits for UM or UIM coverage: $15,000/$30,000; $25,000/$50,000; $50,000/$100,000; and $100,000/$300,000. *See id.* It notes that additional limits are available, but if the insured wants to select a limit not specifically included on the form, the insured will need to consult with an Allstate agent. *See id.* It also points out that the insured's UM/UIM limits can be different for each vehicle. *See id.* The form further references all four of the Limandris' vehicles identified as Vehicles 1 through 4, and next to the four vehicles are check boxes for the aforementioned UM/UIM coverage limits. *See id.* Below the list of vehicles and the UM/UIM

---

[23] The language in pertinent part pertaining to UM coverage is identical.

limit checkboxes is the following sentence: "The limits selected above will apply to all future renewals, continuations, and changes in your policy unless you contact your Allstate agent or we notify you otherwise." *Id.*

Plaintiff's point of emphasis in this case is the language at the top of the form, which basically repeats the requirements of the MVFRL insofar as it provides that if the first named insured does not select lower UM/UIM limits, the limits will be set at an amount equal to the policy's bodily injury liability limits. Unfortunately, despite this language and the Limandris' lack of marking on the checkboxes next to the UM/UIM limits for Vehicles 1 through 3 being the primary focus of Plaintiffs' arguments, Allstate has (as best the court can discern) devoted no part of its brief in support of its motion for summary judgment or its brief in opposition to Plaintiff's motion for partial summary judgment to discussing how the court should interpret this language in relation to the rest of the form.[24]

Despite Allstate not addressing the above language in its briefs, the court agrees with Allstate that Plaintiff is only entitled to $15,000/$30,000 stacked UM/UIM under the Policy. Mr. Limandri unequivocally signed-down the UM/UIM coverage limits to $15,000/$30,000 on all four of the Limandris' vehicles in September 2001.[25] The September 2001 Form provided that those "limits . . . will apply to all future renewals, continuations, and changes in your policy unless you contact your Allstate agent or we notify you otherwise." *See* Pl.'s Facts, Ex. E at ECF p. 3, Doc. No. 16-14. At some point prior to March 2003, the Limandris dropped one of their vehicles, so the Policy covered only three vehicles for a brief period until the Limandris again added a fourth

---

[24] The court recognizes that Allstate's primary argument, that the Limandris did not affirmatively act to change their UM/UIM limits does not necessarily relate to the language on the March 2003 Form indicating that a failure to elect a lower limit results in the UM/UIM coverage being equal to the bodily injury liability limits.

[25] No party or witness claims that the September 2001 Form was not a valid reduction of UM/UIM benefits from the bodily injury liability limits to $15,000/$30,000 for the four vehicles covered by the Policy at the time.

vehicle (not as a replacement vehicle), the 2001 Pontiac Sunfire, in March 2003. Once added to the Policy, the Limandris paid premiums including a premium for UM/UIM coverage limits equal to the bodily injury liability limits until they executed a written reduction of the available UM/UIM limits.[26] The Limandris then executed a new request form in March 2003, which only affirmatively provides information about this new fourth vehicle; namely, that the Limandris were electing lower UM/UIM limits in the amounts of $15,000/$30,000 for "Vehicle 4."[27]

The question presented here is whether the Limandris could change the UM/UIM limits for Vehicles 1 through 3 by failing to check any box for a lower limit for those vehicles on the March 2003 Form and then relying on the statement at the top of the form providing that unless the first named insured selects a lower limit, the UM/UIM limits will equal the bodily injury liability limits. Plaintiff would have the court find that their silence combined with the language at the top of the form constitutes an election for UM/UIM coverage commensurate with the bodily injury liability limits. Allstate argues that the Limandris needed to take an affirmative action. The court agrees with Allstate.

It would be an unreasonable interpretation of the March 2003 Form if the court would conclude that the Limandris, by failing to check any of the boxes for an UM/UIM limit for Vehicles 1 through 3, changed their September 2001 election of UM/UIM limits of $15,000/$30,000 for those vehicles. As Allstate noted, when Mr. Limandri chose the lower UM/UIM limits in September 2001, the form explained that these choices would apply to all future renewals, continuations, and changes in the Policy until they contacted their Allstate agent or Allstate told

---

[26] The history here is reflected in Plaintiff's settlement where she received $140,000 from Allstate as the Allstate representative noted that the Limandris were paying a higher premium for the higher UM/UIM limits at the time of Plaintiff's accident because it occurred between the time the fourth car was added and the March 2003 Form.

[27] As indicated in the court's recitation of the record, it appears more likely than not that someone from Ramos's office, and not the Limandris, checked the box for the coverage limit for Vehicle 4 as Ramos was 90% sure that someone from his office checked the "15/30" box for Vehicle 4.

them otherwise.  Leaving the check boxes blank for Vehicles 1 through 3 on the March 2003 Form is not affirmative evidence of a choice to increase UM/UIM coverages, as there is no indication that they purposefully decided not to check off one of the limit boxes to increase their UM/UIM coverage for those three vehicles.  In addition, the language at the top of the form about not choosing a lower limit resulting in the higher coverage is inapplicable because the Limandris chose lower limits in September 2001 and the March 2003 Form did not affirmatively indicate that they were changing those limits.[28]

Moreover, the title of the form is "REQUEST FOR LOWER LIMITS OF COVERAGE FOR UNINSURED AND UNDERINSURED MOTORIST INSURANCE."  By March 10, 2003, the date of the execution of the March 2003 Form, the Limandris had already elected to have three of their vehicles with the lowest possible UM/UIM limit (out of the specifically identified limits).  The only vehicle with a higher limit was Vehicle 4.  A much more plausible interpretation of the March 2003 Form is that the Limandris did not check any of the boxes for Vehicles 1 through 3 because they were not choosing a "lower" limit for any vehicle other than Vehicle 4 (which would have been at the bodily injury liability levels before the sign-down in March 2003).

To the extent that there is an ambiguity with ascertaining the parties' intent through the form, the overwhelming record evidence supports the court's conclusion that the Limandris intended to keep the $15,000/$30,000 UM/UIM limits on Vehicles 1 through 3 and reduce the UM/UIM limits for Vehicle 4.  Mrs. Limandri testified that she intended her coverages for all vehicles to be uniform; thus, it is much more probable and plausible that the Limandris intended this March 2003 sign-down to match Vehicle 4 with the reduced UM/UIM limits for their other

---

[28] If they were increasing their limits to the bodily injury liability limits of $100,000/$300,000, that option was an available limitation that the Limandris could have affirmatively checked on the March 2003 Form.  They did not do so.

three vehicles. There is no evidence in the record (other than Plaintiff's interpretation of the March 2003 Form) showing that the Limandris ever expressed any intention of increasing the UM/UIM limits on Vehicles 1 through 3 when they executed the March 2003 Request Form.[29] Mrs. Limandri did not state as such during her deposition.

In addition, as noted by Plaintiff, there are restrictions with the court considering the applicability of the information provided in the renewals that Allstate provided to the Limandris every six months for ten years and even the fact that they paid premiums based in part on them carrying $15,000/$30,000 UM/UIM limits on their vehicles. Plaintiffs' arguments are based on a request that the court find that the March 2003 Form was not a valid waiver of UM/UIM coverage. Plaintiffs' arguments are misplaced, however, because the March 2003 Form has no effect on the Limandris' reduction in UM/UIM benefits whatsoever. The valid election of reduced UM/UIM coverage limits occurred in September 2001 and, for Vehicles 1 through 3, those limits continued through the March 2003 Form when the Limandris did not affirmatively change them on the form.

Further, from all indications, the Limandris intended to maintain the $15,000/$30,000 in UM/UIM limits on their vehicles. While the court recognizes that Mrs. Limandri stated that she never read the renewal forms, the Limandris received renewal forms every six months for approximately ten years in which the declarations page showed that the UM/UIM coverage for their vehicles was $15,000/$30,000 and not $100,000/$300,000. The Limandris do not assert that they ever contested these numbers by claiming that they sought higher coverage by complaining to Allstate. In addition, the Limandris paid premiums reflecting the lower UM/UIM coverages for

---

[29] In Mrs. Limandri's deposition testimony, she provided very little relevant evidence concerning the Policy and the history of the Policy, including the various requests to reduce the UM/UIM limits. In addition, Plaintiff, since she was not a named insured under the Policy, acknowledged having very little information about the Policy and playing no role in the types and amounts of coverages under it.

approximately ten years.[30]  Again, if they had sought higher UM/UIM coverages by not checking any of the limitation boxes on the March 2003 Form, common sense dictates that they would have contacted Ramos or someone else at Allstate about their coverage when they realized they were not getting the coverage they requested.  There is nothing in the record stating that the Limandris ever complained about their coverage.

### III.  CONCLUSION

The Limandris executed a valid reduction of their UM/UIM coverage for their four covered vehicles in September 2001 when they signed and returned the September 2001 Form.  The March 2003 Form did not affirmatively change this reduction in limits, and the record contains no evidence of the Limandris' intent to increase the UM/UIM coverage in the three vehicles. Accordingly, at the time of Plaintiff's accident in 2013, where there were two covered vehicles under the Policy, Plaintiff was entitled to seek no more than the $15,000/$30,000 UM/UIM limits stacked by two vehicles.  As such, the court will grant Allstate's motion for summary judgment (insofar as it seeks judgment in Allstate's favor on Plaintiff's declaratory judgment claim) and deny Plaintiff's motion for partial summary judgment on her declaratory judgment claim.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.

---

[30] Although Plaintiff correctly notes that an insured's payments of premiums cannot operate as a waiver, *see Breuninger v. Pennland Ins. Co.*, 675 A.2d 353, 357 (Pa. Super. 1996), her arguments that the Limandris' payment of lower premiums is irrelevant is based on her claim that there is no valid reduction request.  As already discussed, the Limandris did validly reduce their UM/UIM coverage in September 2001, which remained in effect through March 2003.  As such, the payment of premiums consistent with the lower coverage limits is relevant.  *See Kidd v. State Farm Mut. Auto. Ins. Co.*, No. 1:13-CV-2625, 2015 WL 9479997, at *4 (M.D. Pa. Dec. 29, 2015) (discussing plaintiff's enjoyment of reduced premiums due to decreased coverage).